748 A.2d 82

RAYMOND ABBOTT, A MINOR, BY HIS GUARDIAN AD LITEM, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FI-GUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA AND VIVIAN FIGUEROA, MINORS, BY THEIR GUARDIAN AD LI-TEM, BLANCA FIGUEROA; MICHAEL HADLEY, A MINOR, BY HIS GUARDIAN AD LITEM, LOLA MOORE; HENRY STE-VENS, JR., A MINOR, BY HIS GUARDIAN AD LITEM, HENRY STEVENS, SR.; CAROLINE JAMES AND JERMAINE JAMES, MINORS, BY THEIR GUARDIAN AD LITEM, MATTIE JAMES; DORIAN WAITERS AND KHUDAYJA WAITERS, MINORS, BY THEIR GUARDIAN AD LITEM, LYNN WAITERS; CHRISTINA KNOWLES, DANIEL KNOWLES, AND GUY KNOWLES, JR., MINORS, BY THEIR GUARDIAN AD LITEM, GUY KNOWLES, SR.; LIANA DIAZ, A MINOR, BY HER GUARDIAN AD LITEM, LUCILA DIAZ; AISHA HARGROVE AND ZAKIA HARGROVE, MINORS, BY THEIR GUARDIAN AD LITEM, PATRICIA WAT-SON; AND LAMAR STEPHENS AND LESLIE STEPHENS, MI-NORS, BY THEIR GUARDIAN AD LITEM, EDDIE STEPHENS, PLAINTIFFS–MOVANTS, v. FRED G. BURKE, COMMISSIONER OF EDUCATION; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET AND ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; AND NEW JERSEY STATE BOARD OF EDUCATION, DEFENDANTS–RE-SPONDENTS.

Argued October 13, 1999—Decided March 7, 2000.

*David G. Sciarra,* Executive Director, Education Law Center, and *Paul L. Tractenberg,* argued the cause for movants (*Mr. Sciarra,* attorney; *Mr. Tractenberg* and *David B. Thronson,* on the briefs).

*John J. Farmer, Jr.,* Attorney General of New Jersey, argued the cause for respondents (*Mr. Farmer,* attorney; *Jeffrey J. Miller,* Assistant Attorney General, of counsel; *Nancy Kaplen,* Assistant Attorney General, and *Michelle Lyn Miller,* Deputy Attorney General, on the briefs).

*Richard E. Shapiro,* for *amici curiae* City of Asbury Park Board of Education, City of Elizabeth Board of Education and City of Passaic Board of Education.

*Cecelia M. Zalkind,* argued the cause for *amicus curiae* Association for Children of New Jersey.

*Joseph Charles, Jr.,* submitted a brief on behalf of amicus curiae New Jersey Legislative Black and Latino Caucus.

*Paulette Brown,* submitted a brief on behalf of *amicus curiae* Black Ministers Council of New Jersey (*Brown & Childress,* attorneys).

*Melissa Vance Kirsch,* Counsel, submitted a letter brief on behalf of *amicus curiae* New Jersey Association of School Administrators.

*Richard A. Friedman,* submitted a brief on behalf of *amicus curiae* New Jersey Education Association (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

*Robert S. Baumol* and *Maxim Thorne* submitted a letter brief on behalf of *amici curiae* New Jersey Headstart Association and National Association for the Advancement of Colored People (*John D. Atlas,* Executive Director, Passaic County Legal Aid Society, attorney).

*Michaelene Loughlin* and *Lenora M. Lapidus,* submitted a letter brief on behalf of *amicus curiae* Newark Emergency Committee to Save Childcare (*Loughlin & Latimer,* attorneys).

*Joseph S. Sherman*, submitted a letter brief on behalf of *amicus curiae* West New York Board of Education (*Scarinci & Hollenbeck*, attorneys).

The opinion of the Court was delivered by

PORITZ, C.J.

Nineteen months ago, this Court accepted the commitment made by the Commissioner of Education to undertake, in good faith, broad-based educational reform in New Jersey's poor, urban school districts (the "Abbott districts"). *Abbott v. Burke*, 153 *N.J.* 480, 710 *A.*2d 450 (1998) (*Abbott V*). In reliance on the Legislature's "clear recognition of the need for comprehensive substantive educational programs and standards," and on the Commissioner's proposals for reform, we stated our expectation that twenty-eight years of "major judicial involvement" in this extraordinary effort should end. *Id.* at 490, 710 *A.*2d 450.

Yet, once again, we find that we must address issues we thought settled. By motion in aid of litigants' rights, plaintiffs in *Abbott V* have returned to the Court. They ask us to order defendants to "implement forthwith [the] well-planned, high-quality preschool education" promised by the Commissioner during the hearings in *Abbott V;* "provide such facilities and . . . adequate funding as necessary" to implement the required preschool programs; and "designat[e] a Superior Court Judge to supervise" implementation and "adjudicate . . . systemic issues arising [from] non-compliance with . . . *Abbott V.*" At the heart of their request for relief is a claim that the Commissioner has repudiated his promise to provide quality preschool education for the disadvantaged school children who reside in the Abbott districts. In support of their claim, plaintiffs allege systemic failures that only the Court can address.

We reject plaintiffs' contention that the Commissioner has backed away from his efforts to reform education in the Abbott districts, or that his alleged non-compliance with *Abbott V* demonstrates bad faith. We are satisfied that any discrepancies in the

implementation of our decree have resulted from misunderstandings in executing the Court's mandate. We are, however, convinced that the manner in which the Department of Education (DOE) has carried out the preschool mandate of *Abbott V* is not consistent with the Commissioner's representations to the remand court in that case. We conclude that the DOE's use of community care providers staffed by uncertified teachers and governed by Department of Human Services (DHS) daycare standards violates the *Abbott V* requirement to establish quality preschool programs for three- and four-year old children. Our intervention is warranted now to assure that the implementation of preschool in the Abbott districts is faithful to the programs proposed by the Commissioner and accepted by this Court less than two years ago.[1]

## I

*Abbott V* was grounded in "a top-to-bottom commitment to ensuring that the [promised] reforms [would be] conscientiously undertaken and vigorously carried forward." *Abbott V, supra,* 153 *N.J.* at 528, 710 *A.2d* 450. The task was, and is, enormous. In effect, a major transformation in the educational system servicing the State's poor, urban districts has been authorized by the Legislature, advanced by the executive branch, and affirmed by the Court. It is not surprising that the road has been rough, or that progress has been slower than the parties had hoped it would be. There is, indeed, general acknowledgment among the parties and *amici* that the time frame established by the Court for

---

[1] Our concurring colleague discusses at some length issues relating to the implementation of whole school reform even though those issues are not "expressly" before us, and "even in the absence of a more specific record." *Infra* at 128, 748 *A.2d* at 100. Whole school reform has not been raised by the parties; nor do we have a record on which to base a judgment on this subject. In short, whole school reform is not before us. We express no views on the Commissioner's leadership or decision making in respect of the choice of whole school reform models in the Abbott districts.

implementing preschool programs in all of the Abbott schools by the 1999–2000 school year was difficult to meet.

By the same token, another generation of children will pay the price for each year of delay. The record in *Abbott V* overwhelmingly demonstrated that substantive, quality early-childhood education does make a difference, and that poor urban youngsters do better academically when they have participated in enriched preschool programs from an early age. Our Constitution requires a thorough and efficient education for all of our children because we believe that educated citizens are better able to participate fully in the economic and communal life of the society in which we all live. Quality preschool, whole school reform, adequate, secure school buildings in which to learn, health and social services, and other programs as needed—those are the elements of a commitment made to the Abbott children, to their future.

The momentum for reform must not slow. In *Abbott V* we made certain assumptions about the proposals before us. It is appropriate now for us to clarify those assumptions in order to provide further guidance for the implementation of preschool programs in the Abbott districts.

The Court's intent in *Abbott V* was expressed in the first paragraph of its opinion:

> Our Constitution mandates that the "Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4, ¶ 1. This decision explains the remedial measures that must be implemented in order to ensure that public school children from the poorest urban communities receive the educational entitlements that the Constitution guarantees them.
>
> [*Abbott V, supra,* 153 *N.J.* at 489, 710 *A.*2d 450.]

The genesis of the remedial measures endorsed by the Court in *Abbott V* lay in the remand proceedings ordered a year earlier in *Abbott v. Burke,* 149 *N.J.* 145, 693 *A.*2d 417 (1997) (*Abbott IV*). In *Abbott IV*, we reaffirmed our earlier direction "that the State address special education needs by determining and implementing ... supplemental programs essential to relieve students in the

special needs districts [SNDs] of their unique disadvantages." *Id.* at 189–90, 693 *A.*2d 417. Because the scope and content of appropriate programs for at-risk children lies "squarely within the special expertise of educators," *id.* at 199, 693 *A.*2d 417, we remanded the matter to the Superior Court to conduct proceedings designed to identify both supplemental program and capital facility needs. *Id.* at 199–200, 693 *A.*2d 417.

The proceedings that followed are described in considerable detail in the report of Judge King, a Presiding Judge of the Appellate Division temporarily assigned to oversee the remand, *Abbott V,* Appendix I, 153 *N.J.* at 529, 710 *A.*2d 450, and in the Court's opinion in *Abbott V, supra,* 153 *N.J.* at 493, 710 *A.*2d 450. It bears repeating, however, that educators with substantial credentials [2] participated in seventeen days of hearings that focused on reports submitted by the Commissioner and the plaintiffs, and that a highly-qualified, court-appointed expert, Dr. Allan Odden,[3] assisted Judge King and submitted his own report on supplemental program and facilities issues. *Abbott V,* Appendix II, 153 *N.J.* at 636, 710 *A.*2d 450. After reviewing Judge King's recommendations and the extensive record of expert testimony and research results developed on remand, this Court, in large measure, adopted the Commissioner's proposals.

---

[2] Among others, the following experts testified before Judge King: Dr. Gerald DeMauro, Director of the Office of Assessment, New Jersey Department of Education; Dr. Jeremy Finn, Professor of Education, SUNY Buffalo; Ms. Leslie Ann Morris, Project Coordinator, Snyder High School Adolescent Health Center, Jersey City; Dr. Gary Nutriello, Professor of Sociology and Education, Department of Human Development, Teachers College of Columbia University; Dr. Jeffrey Osowski, Assistant Commissioner, Division of Information and Management Services, New Jersey Department of Education.

[3] Allen Odden, Ph.D., is a Professor in the Department of Educational Administration at the University of Wisconsin–Madison and Co–Director of the Consortium for Policy Research in Education at the Wisconsin Center for Education Research. His research and scholarly work focuses on educational policy, finance, and resource allocation.

Most relevant to plaintiffs' motion, the Court found that the Legislature had recognized the need for "early childhood education for three- and four-year olds in the poorest school districts." *Abbott V, supra,* 153 *N.J.* at 505, 710 *A.*2d 450 (discussing Comprehensive Educational Improvement and Financing Act of 1996 (CEIFA), specifically *N.J.S.A.* 18A:7F–16). Based on the funding formula found at *N.J.S.A.* 18A:7F–16, the Commissioner's authority as delineated in *N.J.S.A.* 18A:7F–6b, and the administrative regulation implementing CEIFA, *N.J.A.C.* 6:19–3.2d, "[t]he Court direct[ed] the Commissioner to exercise his power ... to require all Abbott districts to provide half-day pre-school for three- and four-year olds." *Abbott V, supra,* 153 *N.J.* at 508, 710 *A.*2d 450. We said further:

[T]he Commissioner must ensure that such programs are adequately funded and [must] assist the schools in meeting the need for transportation and other services, support, and resources related to such programs. The Commissioner may authorize cooperation with or the use of existing early childhood and day-care programs in the community.

[*Ibid.*]

It is the scope and content of our direction in *Abbott V* that requires further discussion in this opinion.

**II**

■ We begin with plaintiffs' general contention that "the State has gravely defaulted on its commitment" to implement "well-planned, high quality preschool education for all Abbott children." Plaintiffs focus on such quality indicators as substantive educational programming guided by DOE standards, as well as other indicators understood to affect quality including, *inter alia,* class size, teacher certification, and supplemental program needs, all funded at the levels requested by the SNDs. We will speak to these concerns separately; however, some comments about quality preschool education are warranted.

The testimony of numerous educators, the reports submitted by the parties and by Dr. Odden, and the recommendations of Judge King confirm a core understanding that the needs of at-risk

children can be met only by quality preschool programs.[4] By way of example, Dr. Odden, who had recommended full-day programs for three- and four-year olds, stressed the "large positive benefits" that would result:

> Research is very clear that *high quality,* preschool programs for students from low income backgrounds have discernible, positive, and significant impacts on student academic achievement in the early academic years . . . .
>
> [*Abbott V,* App. II, *supra,* 153 *N.J.* at 648, 710 *A.*2d 450 (emphasis added).]

*Abbott V,* quoting the Commissioner, emphasized these points:

> As the Commissioner's research itself demonstrates: *"Well-planned, high quality* half-day preschool programs . . . help close the gap between the home and school environments and the educational expectations that lead to academic success."
>
> [*Abbott V, supra,* 153 *N.J.* at 503, 710 *A.*2d 450 (alteration in original)(emphasis added).]

The disagreement, then, is not about the need for quality preschool education; as is too often the case in such matters, the disagreement is about the program components that constitute quality preschool education. In *Abbott V,* we relied heavily on the specific proposals put forward by the Commissioner and his experts without describing them in detail. We do so now because the programs that have been implemented do not conform to the proposals that were accepted by the Court.

## A. *Substantive Standards*

Plaintiffs and *amici* allege that the Commissioner has not established substantive standards describing the educational content of preschool programs. Without core curriculum standards akin to those developed by the DOE for grade schools but specific to preschool levels, disadvantaged children in the Abbott districts will get little more than daycare. This nomenclature is critical. The distinction between "daycare," which does *not* generally provide structured, educational programming geared toward school-

---

4 CEIFA allows the use of early childhood program aid (ECPA) during the first four years of distribution "for educationally meritorious programs," indicating the Legislature's intent to focus ECPA funding on quality education. *N.J.S.A.* 18A:7F–16.

readiness skill development, and "preschool" or "preschool education," which *is* intended to prepare children for success in elementary school, lies at the core of this case. In order for disadvantaged children to develop the language skills and discipline they need for later academic success, there must be educational content to their preschool experience.

The record is sparse on this subject. Under regulations adopted by the DOE on September 1, 1999,

> districts are required to provide developmentally appropriate programs, under the supervision of master teachers, for the 1999–2000 school year, and the Department will provide districts, by the 2000–2001 school year, with specific guidance on developmentally appropriate standards/expectations to provide uniform quality.

*[N.J.A.C.* 6:19A–3.1.]

*N.J.A.C.* 6:19A–3.3(d) deals with master teachers, who are to "coordinate and facilitate early childhood programs and assist in the provision of early childhood professional development." Each district is expected to provide one master teacher for every twenty preschool classrooms. Where the districts contract with DHS-licensed child care providers, see *infra* at 128, 748 *A*.2d at 100, it is the master teacher who is expected to assist the providers in the development of programming "aligned with the Core Curriculum Content Standards and ... integrated with the [Whole School Reform] model(s), or the whole school alternative program design(s) utilized in the district ...." *N.J.A.C.* 6:19A–3.3(b)(2).

The intent of these provisions, as stated by the Commissioner, is to "establish uniform standards for early childhood programs that emphasize articulation with whole school reform programs and Core Curriculum Content Standards." We are also informed that the DOE has hired Dr. Robert Slavin, co-director of the Center for Research on the Education of Students Placed at Risk, to assist in the development of a preschool curriculum to complement the Success For All (SFA) program discussed in *Abbott V.* In three districts there already exists a "Curiosity Corner" pilot that

accomplishes this goal. Similarly, some districts are using other models described in *Abbott V*, such as the High Scope/Perry Preschool program and the Abecedarian model.

We understand that the Commissioner has established Rapid Intervention Teams to work with the districts to oversee both the opening of preschool programs and to assist daycare providers in "molding together, both fiscally and programmatically, two very different systems." Such staff assistance cannot substitute for substantive standards promulgated by the Commissioner. Although the DOE has promised to adopt standards by the 2000–2001 school year, more concrete guidance for this school year would have been preferable. Without adequate standards the DOE will be unable to evaluate preschool programs or to prevent the development of a two-tiered system in which one group of children is offered daycare and another group is offered high-quality preschool. We take notice of draft standards now under review by educators around the state. *See* http://www.state.nj.us/njed/ece. It is reported that the DOE anticipates a final document shortly.

Substantive educational guidance for all Abbott district preschool programs is an essential component of DOE's commitment to the Abbott districts and must be adopted by April 17, 2000, so that the districts will be able to prepare for the 2000–2001 school year.

### B. *Other Elements of Quality Preschools*

#### 1. *Certification*

Plaintiffs, joined by the New Jersey Education Association and the Association for Children of New Jersey (ACNJ), also contend that the teacher certification standards set out at *N.J.A.C.* 6:19A–3.3 will not guarantee high-quality preschool. The ACNJ points to *N.J.A.C.* 6:19A–3.3(b)(4)(ii), under which DHS-licensed daycare providers can hire new teachers holding only a two year

associate's degree [5] and not a bachelor's degree. They explain that the Commissioner promised certified teachers, but that the new regulations permit the hiring of non-qualified staff. Likewise, the ACNJ has expressed its concern that even the associate's degree may be waived under section 3.3(c) of the DOE regulations, a provision that the ACNJ claims is so vague it will undermine the certification requirements entirely.

In the *Abbott IV* remand proceedings the State proposed "one teacher and one aide for each half-day preschool class." *Abbott V*, App. I, *supra*, 153 *N.J.* at 559, 710 *A.*2d 450. The estimated budget at "$51,000 per teacher," *ibid.*, suggests that certified teachers were contemplated. Judge King observed that the State's specific "recommendations and budgets for preschool ... were consistent with ... legislative requirements," that anticipated certified teachers. *Abbott V*, App. I, *supra*, 153 *N.J.* at 560, 710 *A.*2d 450. There was also, during the remand, some discussion of specialized credentials for preschool teachers. Dr. Barnett, testifying for the plaintiffs, supported the establishment of new teacher credentials geared toward the education of children under six. At no point was it suggested that the then-existing regulations requiring a certificate, *N.J.A.C.* 6:11–31(a), with an elementary endorsement, *N.J.A.C.* 6:11–6.2(a)(6) (described as "authoriz[ing] the holder to serve as elementary school teacher in grades nursery through eight in all public schools"), would not pertain to all preschool programs in the SNDs. In short, the testimony contemplated, and the Court understood, that the Abbott preschool programs would be staffed by certified teachers.

Teacher certification is unquestionably an important component of any preschool education program. *See, e.g., Abbott V*, App. II, *supra*, 153 *N.J.* at 651, 710 *A.*2d 450 (explaining that teachers, not instructional aides, are catalysts for improved student perfor-

---

[5] *N.J.A.C.* 9A:1–2.3 provides: "Each educational program leading to an associate degree shall consist of college courses totaling at least 60 but no more than 66 semester credit hours...."

mance). *Abbott V* assumed teachers capable of providing high-quality programs to at-risk children, *i.e.*, certified teachers as then required by DOE regulations. Indeed, the DOE has recognized the link between quality preschool and qualified staff. The Department has proposed a new preschool–3 certificate, referenced at *N.J.A.C.* 6:19A–3.3(b). Under this regulation, existing teachers employed by DHS-licensed providers are given time to obtain both a bachelors' degree and the new certification, even though *N.J.A.C.* 6:11–3.11 states that all teachers, with the exception of vocational teachers, are required to hold a baccalaureate degree. DOE permits those teachers to:

> i. Work toward a bachelor's degree in six years and the proposed preschool–3 certificate, if the teacher already has Child Development Associate (CDA) or Certified Childcare Professional (CCP) credentials; [6] or
>
> ii. Enroll in a CDA/CCP program, attain CDA/CCP credentials within two years and work toward an associate's degree in early childhood and a bachelor's degree within six years and the proposed preschool–3 certification, if the teacher does not have a CDA/CCP or any degree ....
>
> [*N.J.A.C.* 6:19A–3.3(b)(3).]

Likewise, the requirements for newly hired teachers employed by DHS-licensed providers are also relaxed. Those teachers must either:

> i. Have a bachelor's degree, enroll in the Department's provisional teacher program and obtain appropriate early childhood education courses, and obtain the proposed preschool–3 teacher certification by September 2001;
>
> ii. Have an associate's degree in early childhood education and enroll in a bachelor's degree program that would lead to a teacher certification in early childhood education by September 2004; or
>
> iii. Have a K–8 teacher's certificate, enroll in early childhood courses now, and seek the proposed preschool–3 certificate as soon as it becomes available ....
>
> [*N.J.A.C.* 6:19A–3.3(b)(4).]

Finally, under the new regulations, a school board may request a waiver from the Department if the board seeks to contract with a DHS-licensed facility that cannot meet the requirements for new

---

[6] The educational requirements for a CCP credential are a high school diploma, 720 hours of child care experience, and 180 hours of formal child care education. A CDA credential requires 480 hours of child care experience and 120 hours of formal child care education.

hires, but nonetheless agrees to hire teachers with CDA/CDP credentials. *N.J.A.C.* 6:19A–3.3(c). As a prerequisite for invoking waiver, a board must demonstrate that "teachers with a bachelor's degree or an associate's degree in early childhood education are not available." *Ibid.*

We recognized in *Abbott V* that "cooperation with or the use of existing early childhood and day-care programs in the community" would likely be both necessary and appropriate. *Abbott V, supra,* 153 *N.J.* at 508, 710 *A.2d* 450. Dr. Barnett, plaintiffs' expert, testified that "there are resources in these communities that schools ought to work collaboratively with . . . and . . . that there are already facilities out there . . . ." As a practical matter, given the time constraints within which the districts were required to develop half-day programs for three- and four-year olds, use of operating daycare centers has obvious benefits—existing facilities and staff, links to the community, and wrap-around daycare for working parents, among others.

As plaintiffs and various *amici* point out, however, existing DHS-licensed daycare programs do not require certified teachers. *N.J.A.C.* 10:122–4.3, –4.6. Many daycare teachers have extensive experience working with young children, but do not hold the necessary credentials to continue in their jobs should certification now be required. Although the new regulation is unclear about the precise time frame in specific circumstances, existing teachers in daycare programs are allowed a substantial amount of time to obtain a baccalaureate degree and to become certified. It appears that both persons who already hold college credits and persons who hold no college credits at all have six years to obtain a college degree. It is also not clear whether someone who does not possess either CDA or CCP credentials has six years or eight years to obtain a bachelor's degree and a preschool–3 certificate. *See N.J.A.C.* 6:19A–3.3(b)(3)(i)(ii). Moreover, daycare providers are permitted to hire new teachers with two-year associate's degrees and without any certification. New hires with only an associate's degree are given until 2004 to obtain a bachelor's

degree and teaching certificate. *See N.J.A.C.* 6:19A–3.3(b)(4)(i)(ii).
Assuming that the district-run schools are held to the more
stringent requirements of *N.J.A.C.* 6:11–3.1 *et seq.,* it appears that
the DOE has created the two-tiered system ACNJ fears. Under
this system, district-run schools will have qualified teachers;
DHS-licensed providers will not. Indeed, a broad interpretation
of the waiver provision would permit DHS-licensed providers to
hire minimally qualified teachers.

██ If teachers now employed by daycare centers are not given
time to obtain their bachelor's degrees they will lose their jobs.
Yet, without qualified teachers, the children will lose the opportu-
nity that well-run, substantive preschool programs offer. Reason-
able but limited time frames are consistent with the goal of
providing qualified teachers as soon as practicable. The DOE's
regulations delay for too long staffing every preschool classroom
with a fully qualified teacher. The regulations must be clarified
and the time frames shortened in order to eliminate as quickly as
possible any disparity between district-run and DHS-licensed pre-
school programs. Certainly, existing, uncertified preschool teach-
ers must be required to demonstrate that they are proceeding
toward their degrees and preschool–3 certificates.[7] Under the
present regulation, an unqualified person could remain in a teach-
ing position for up to six years without making any progress in
obtaining the necessary credentials. Existing teachers who have
experience working with young children but who otherwise lack
academic credentials should be given four years to obtain certifica-
tion and should be evaluated each year to determine whether they
will be retained. This approach effects a reasonable compromise
during this transition period. New teachers, however, must be

---

[7] We note that the Assistant Commissioner for Legal and Regulatory Affairs at
DHS has submitted an affidavit stating that the State's early childhood initiative
includes a one-million-dollar scholarship program for Abbott district staff to
obtain college degrees in early childhood education or CDA/CCP credentials.
Without more information, we are unable to determine whether this amount is
sufficient, but trust that additional funding will be made available, if needed, to
help existing daycare staff achieve certification.

college graduates and should have until September 2001 to obtain the proposed preschool–3 certificate. The September 2001 deadline is consistent with the timely implementation of quality preschool envisioned by *Abbott V. See N.J.A.C.* 6:19A–3.3(b)(4)(i).

 Submissions by the parties suggest that there is currently a shortage of certified teachers, but the motion record does not inform us fully about the nature or extent of any such shortage. We share ACNJ's concern that *N.J.A.C.* 6:19A–3.3(c), the waiver provision, does not provide sufficient guidance for schools attempting to demonstrate that certified teachers cannot be found. Clear standards should be developed, setting forth the showing that must be made before waivers are granted (*e.g.*, that advertisements were placed, that colleges were contacted, etc.). Furthermore, waivers should be limited to one year unless a subsequent similar showing is made. If certified teachers cannot be found for preschool, we anticipate that increased efforts and further coordination with New Jersey's higher educational institutions will be necessary.

### 2. *Class Size*

 The State's plan as submitted to Judge King set preschool class size at a 1:15 teacher-to-student ratio. *Abbott V,* App. I, *supra,* 153 *N.J.* at 558, 710 *A.2d* 450. That recommendation was based on research demonstrating that enriched programs at the preschool level "reduce[ ] the chances that disadvantaged children will be retained or assigned to special education in the early grades." *Ibid.* The plaintiffs contended that the State's proposal did not go far enough and advocated class sizes even smaller than fifteen students per teacher. *Abbott V,* App. I, *supra,* 153 *N.J.* at 578, 710 *A.2d* 450.

Although Judge King made certain alterations to the Department's model in his recommendations to the Court, class size was not mentioned in connection with preschool. *Abbott V,* App. I, *supra,* 153 *N.J.* at 609–10, 710 *A.2d* 450 (discussing need to reduce class sizes at various grade levels). In *Abbott V,* the Court

likewise did not specifically discuss class size for preschoolers, relying instead on the representations and testimony during the remand hearings and in the Commissioner's report. Dr. Barbara Anderson, Assistant Commissioner for the Division of Student Services at DOE, testified that the Commissioner recommended a preschool class size of fifteen students with one teacher and one aide. The Assistant Commissioner for Finance at DOE testified that he had prepared cost estimates by assuming preschool classes would have a 1:15 teacher-to-student ratio. DOE hired the Vitetta Group, an architectural and engineering consulting firm, to assess facilities needs in the twenty-eight SNDs. *Abbott V*, App. I, *supra*, 153 *N.J.* at 615, 710 *A.2d* 450. In making its calculations and recommendations, the Vitetta Group assumed that each preschool class would consist of a maximum of fifteen students. *Id.* at 618, 710 *A.2d* 450. It is certainly fair then to assume that the State intended to implement a 1:15 teacher-to-student ratio.

The new regulations adopted by the DOE subsequent to the Court's decision in *Abbott V* addressed the issue of class size. *N.J.A.C.* 6:19A–3.3(b) states:

The board shall contract with a DHS-licensed child care provider to provide services to preschool students during the 1999–2000 school year when that provider agrees to meet the following standards:

1. Provide one teacher and one aide for every 15 students, or one teacher and two aides for every 20 students . . . .

Even if we assume that the DOE experts were describing a "model" program for the implementation of high-quality preschool, as the State now claims, that model became the basis for the Court's decision in *Abbott V*. That model clearly called for small classes headed by a qualified teacher, and not one teacher and two aides for every twenty students as permitted by the Department's new regulation. We observe that in Dr. Odden's report to Judge King, the Special Master cited to the results of two separate academic studies finding that the addition of "an instructional aide in a regular classroom produces little if any achievement effect." *Abbott V*, App. II, *supra*, 153 *N.J.* at 651, 710 *A.2d* 450. The

model proposed by the Commissioner is supported in the research literature he referenced.

We reaffirm the requirement of one certified teacher for every fifteen preschool children.

### C. *Daycare Provider Contracts*

■ During the *Abbott IV* remand proceedings both plaintiffs and the State recommended collaboration between the districts and existing community daycare programs. The parties recognized that a readily-available source of staff and facilities could be found in the DHS-licensed programs then operating in the Abbott districts. In *Abbott V* the Court understood the need for collaboration and explicitly authorized the use of community based programs. *Abbott V, supra,* 153 *N.J.* at 508, 710 *A.*2d 450.

Following *Abbott V,* in February 1999, Assistant Commissioner Barbara Anderson sent letters to the SNDs asking for revisions to the 1999–2000 early childhood program plans that had been submitted to the DOE to implement the Court's decision. The Assistant Commissioner informed the districts that they must "collaborate with local ... DHS ... licensed child care providers and [must] use those providers whenever practical to implement required preschool programs." The districts were also told that "[d]uplication of programs or records otherwise available in the community [was] prohibited" and that they could "rely upon the DHS licensure requirements as sufficient to ensure an appropriate level of quality for these programs ..." The DHS regulations, however, are designed to provide for supervision of small children in a daycare setting, see *N.J.A.C.* 10:122–1.2(a); they are not designed to provide a preschool educational experience that prepares disadvantaged children to achieve academically in school.

Subsequently, the DOE adopted *N.J.A.C.* 6:19A–3.3, which states:

The board shall cooperate with or utilize a DHS-licensed child care provider whenever practical to implement required preschool programs and shall not duplicate programs or services otherwise available in the community. When the

board enters into a contract with a DHS-licensed child care provider for the 2000–2001 school year, the contract shall be in a form provided by or approved by the Department. The board shall contract with a DHS-licensed child care provider to provide services to preschool students during the 1999–2000 school year when that provider agrees to meet [guidelines relating to teacher-to-student ratio, teacher qualification, supplemental programs, master teachers, and family workers].

[*N.J.A.C.* 6:19A–3.3(b).]

By its terms, the regulation permits exceptions to collaboration with DHS providers only upon a showing that cooperation with a particular provider is impractical.

Subject to the conditions imposed by the Court in this opinion, the use of daycare providers "whenever practical" comports with *Abbott V* for all of the reasons previously advanced, see *supra* at 102, 748 *A*.2d at 87–88. Not to use those resources would make no sense, especially when the need is so great and the time frames for implementation so short. The Assistant Commissioner for Legal and Regulatory Affairs has certified that the "DHS has made a substantial financial investment in child care services," including the allocation of $170 million in Fiscal Year 1999 and $200 million in Fiscal Year 2000. We are confident that, when revised to comport with this opinion, the new regulations and the substantive standards to be developed by the DOE will establish a baseline for upgrading daycare centers into well-run preschools. When an existing daycare center is unable or unwilling to comply with those requirements, cooperation with that center would be presumptively not "practical" under *N.J.A.C.* 6:19A–3.3(b).

We also note that direct district operation of a program means district responsibility for quality and ensures accountability within the district administrative structure. Contracts between the districts and daycare providers raise questions about responsibility and accountability that are not answered on the record before us. *N.J.A.C.* 6:19A–3.3(b) states that "the contract shall be in a form provided by or approved by the Department," but no form of contract has been provided to the Court.

██ We agree with the ACNJ that contractual agreements with DHS-licensed providers must "include clear expectations, necessary supports and accountability measures." Only by delineating the specific responsibilities of the district and the provider, can there be evaluation and accountability based on the specific tasks assigned to each. Ultimately, it is the district that must have the power to assess and evaluate providers and to impose improvements if necessary. Termination of the contract by the district must be an option when the provider cannot or will not adhere to quality standards. On the other side, the support to be provided by the district is also critical, whether in the form of supervision, professional development, access to specialized staff, or assistance in complying with federal and state requirements for special education, bilingual education, and other needed services. Ultimately, it is the responsibility of the districts and the DOE to monitor operating preschools on a regular basis and to ensure that they are delivering quality programs. Contracts between the districts and providers must spell out these and other requirements deemed appropriate by the Commissioner.

 The DOE has excluded Head Start, an existing federally-funded program, from district enrollment projections based on the assumption that Head Start will continue to serve district children in the next school year. Head Start programs, however, present unique issues. As high-quality daycare, Head Start offers substantial opportunities for disadvantaged children. State preschool standards are, however, more demanding than Head Start program standards. *See, e.g.,* 42 *U.S.C.A.* § 9843a (requiring that merely fifty percent of teachers have advanced degrees); 45 *C.F.R.* § 1304.21 (providing loose content standards); 45 *C.F.R.* § 1306.32 (allowing twenty students per class). The districts can exclude Head Start children from their preschool enrollment projections only when it can be demonstrated that the excluded children attend Head Start programs that meet DOE standards. The NAACP also alleges that children are not allowed to attend Head Start programs if their parents drop out of a required

Temporary Aid for Needy Families program. Preschool programs are for *all* Abbott district children—no child may be excluded from a preschool program that is part of a district plan because of parental status.

### D. *Facilities and Supplemental Program Funding*

In *Abbott V* we addressed preschool funding:

> If any Abbott schools are able to obtain the space, supplies, teaching faculty, staff, and means of transportation that are necessary to implement these programs for the 1998–1999 school year, they should be supplied with the necessary funding to enable them to do so. The Commissioner shall ensure that all other Abbott schools shall have the resources and additional funds that are necessary to implement preschool education by the commencement of the 1999–2000 school year.
>
> [<em>Abbott V,</em> 153 <em>N.J.</em> at 508, 710 <em>A.</em>2d 450.]

Plaintiffs and *amici,* specifically the cities of Asbury Park, Elizabeth, and Passaic, allege that the State has failed to comply with the *Abbott V* mandate because DOE has denied funding for preschool facilities improvements. It is also alleged that the districts' requests for supplemental programs and transportation funding have been uniformly rejected by the DOE, again in contravention of *Abbott V.*

In February 1999 Assistant Commissioner Barbara Anderson sent a form letter to the districts denying their supplemental funding requests and advising that such requests should not be submitted as part of the districts' operational plans, but rather through a separate specified process. It appears that prior to this point the districts had received little by way of instruction from the DOE about supplemental funding applications. The lack of early guidance from the DOE resulted in submissions the DOE then deemed unsatisfactory and this, in turn, caused frustration with the supplemental funding process.

The Agency's decision to deal with district operational plans separately from supplemental programs is no doubt within the agency's prerogatives. The DOE asserts that supplemental requests are being approved and funded under its procedures, as are requests for temporary facilities when they are needed. These

matters are precisely the type of fact-sensitive disputes that the Office of Administrative Law (OAL) is prepared to handle. We cannot decide them here without a record, nor should we. Nonetheless, we cannot ignore the DOE's form-letter response to the districts' requests, and caution that reasonable requests to fund supplemental programs must be handled fairly and quickly.

*Abbott V* held that "even though it is not feasible at this time to ascertain or mandate a specific funding level, adequate funding remains critical to the achievement of a thorough and efficient education." *Abbott V, supra,* 153 *N.J.* at 517–18, 710 *A.*2d 450. We also said that "the Commissioner may, before seeking new appropriations, first determine whether funds within an existing school budget are sufficient to meet a school's request for a demonstrably needed supplemental program." *Id.* at 518, 710 *A.*2d 450. The Commissioner indicates that he sought and obtained 37 million dollars in supplemental funding for the 1999–2000 school year and that if there is a need for additional monies during the course of the school year he will entertain applications from the districts at any time in accordance with the DOE's regulations. The DHS has made available approximately $12 million dollars to child care centers for facility expansion, renovation, equipment, and supplies. Only after a review of individual applications from the districts can it be determined whether "adequate funding ... critical to the achievement of a thorough and efficient education" has been provided. We urge the Commissioner to work with the districts to resolve funding issues expeditiously; when an amicable resolution is not possible, decision making must occur early enough in the school year to allow programs to be implemented by the next school year. See *infra* at 119, 748 *A.*2d at 95.

### E. *Community Outreach*

There is apparently some misunderstanding about the DOE requirement that the districts plan for seventy-five percent of their anticipated preschool enrollment (based on the number of

children in kindergarten the previous year) instead of 100 percent or full enrollment. The plaintiffs claim that *all* of the Abbott children must be accommodated and that to plan for only seventy-five percent is to renege on the State's commitment. But the Commissioner has allowed individual districts to develop their own enrollment projections based on reliable indicators and, more important, has stated unequivocally that every child who seeks to enroll in preschool will be accommodated. The issue is not enrollment numbers for planning purposes, but rather, whether there is a need for community outreach to inform parents about the availability of preschool for three- and four-year old children in the Abbott districts. *Amicus curiae* Newark Emergency Committee to Save Childcare (the Committee) has expressed its concern that:

> The DOE has failed to require that significant efforts be made to recruit as many children as possible into the Abbott preschool program. Based on the Committee's member centers' experiences, the children who are hardest to reach are often the ones who need high quality preschool the most. An aggressive recruitment campaign is critical.

We have emphasized the need for assessment and evaluation of preschool programs in the SNDs. We expect that existing enrollments can now be reviewed and that low enrollments will trigger a determination whether parents in the community are aware of the district's preschool programs. If parents are not, the district must make concerted outreach efforts to improve enrollments; if needed, the Commissioner must make funding available for this purpose through the DOE's supplemental program procedures.

### III

We are told that no other State has attempted to build a quality-preschool network that merges pre-existing community daycare centers and district-run programs into a coherent unified system drawing upon social service and education funding streams. By 2001, the State plans to fund full-day programs for all three-and four-year olds in the Abbott districts. *N.J.A.C.*

6:19A–3.4. At the same time, and as *Abbott V* anticipated, it is inevitable in an undertaking of this magnitude that there will be disputes about the "implementation, extension, or modification of existing programs, the need for additional supplemental programs, the allocation of budgeted funds, the need for additional funding, and the implementation of the standards and plans for the provision of capital improvements and related educational facilities." *Abbott V, supra,* 153 *N.J.* at 526, 710 *A.*2d 450. Indeed, many of the various factual and legal issues now before us are not resolved by this opinion and remain pending in the OAL before the Chief Judge.

We do not see the need for the appointment of a Judge of the Superior Court as a Standing Master, and reaffirm the jurisdiction of the OAL to hear "controversies" arising under the School Laws. *N.J.S.A.* 18A:7A–1 to 7F–34. This disposition *is* consistent with our view in *Abbott V* that education disputes are properly decided in the first instance by those statutorily entrusted with that responsibility. In this case, because the districts were required to submit their plans for 2000–2001 on January 15, 2000, adjustments will likely be required. It is also likely that district plans will need revision based on this opinion, and on the outcome in pending administrative proceedings. Those disputes now pending, and those filed in response to DOE action in respect of revised plans, must be expedited in the OAL to the end that final dispositions are issued in time for implementation in the 2000–2001 school year.

Quality preschool programs are a critical component of the whole school reform effort approved in *Abbott V.* Cooperation between the districts and the DOE is essential to this effort if it is to succeed. For too long, there has been suspicion and distrust. The ACNJ has built a coalition of educators and providers that demonstrates the value of collaboration and consensus building. It is our hope that the adversarial relationship between the parties will give way to a cooperative effort focused on the provision of

high-quality preschool programs for children in the Abbott districts. The children deserve no less.

## IV

Plaintiff's motion in aid of litigant's rights is granted in part and denied in part.

STEIN, J., concurring.

The longstanding inability of urban public schools throughout the nation to provide an adequate education to minority students from low-income families represents the most enduring public policy failure of my generation. For much of the past fifty years state governments generally were unwilling to focus on the ills of urban schools. Over the past two decades, however, the issue has attracted both state and national attention. Throughout the country reforms in urban education have been implemented and found wanting. In major cities, new superintendents are hired and fired with regularity. Candidates for public office promise to repair urban education, but the promises are seldom kept and, when implemented, rarely succeed.

In New Jersey, as in other states, failures in urban education have led education advocates to turn to our courts for relief. For the twenty-five years following this Court's first disposition in school funding litigation, see *Robinson v. Cahill,* 62 *N.J.* 473, 303 *A.*2d 273 (1973), the focus has been on fiscal parity. Recently, the emphasis has shifted from funding equity to educational adequacy, see *Abbott v. Burke,* 149 *N.J.* 145, 693 *A.*2d 417 (1997) (*Abbott IV*) and *Abbott v. Burke,* 153 *N.J.* 480, 710 *A.*2d 450 (1998) (*Abbott V*). That shift in focus from funding to educational adequacy is replicated in other states. See James E. Ryan, *Schools, Race and Money,* 109 Yale L.J. 249, 268–69 (1999).

In *Abbott V,* on the basis of testimony presented by the Commissioner of Education and other educational experts, this Court accepted the State's commitment to implement one of the most ambitious urban school initiatives in the country, combining man-

datory preschool for three- and four-year olds, full-day kindergarten, whole school reform including an unprecedented emphasis on reading and language skills in grades K–3, availability of necessary social services in school facilities or through outside providers, and a major facilities repair and renovation program for the aging physical plants of urban school districts. The motion to enforce litigants' rights that the Court resolves today involves issues concerning only the preschool portion of the initiatives ordered in *Abbott V.* However, an inextricable connection exists between those issues and the potential for success of the totality of the urban school reforms set in motion by the Commissioner's presentation and this Court's opinion in *Abbott V.* I write separately primarily to make crystal clear the significance of that connection.

I

I join in the Court's disposition of this motion. I am somewhat less sanguine than the Court concerning the underlying explanation for the Department of Education's (DOE) initially flawed implementation of preschool in Abbott districts. Nevertheless, I fully agree with the Court's basic holding: the DOE's insistence that the Abbott districts implement preschool by using local community care providers staffed by uncertified teachers and governed by Department of Human Services (DHS) standards and regulations, without any substantive educational standards, violated *Abbott V*'s requirement that high quality preschool programs be implemented in all the Abbott districts. Simply stated, a vast and fundamental difference exists between the day-care type programs mandated by the DOE, and the education-based preschool program contemplated by the Court. The educational focus of the preschool program envisioned by the Court was underscored in *Abbott V:*

> This Court is convinced that pre-school for three- and four-year olds will have a significant and substantial positive impact on academic achievement in both early and later school years ... [T]he evidence strongly supports the conclusion that, in

the poor urban school districts, the earlier children start pre-school, the better prepared they are to face the challenges of kindergarten and first grade.

[*Abbott V, supra,* 153 *N.J.* at 506–07, 710 *A.*2d 450.]

I also am in substantial agreement with the corrective measures ordered by the Court. The need for the prompt adoption by the DOE of clear substantive standards is incontestable. I fully agree that the Court contemplated that preschool teachers would be fully qualified and certified, consistent with the testimony of Commissioner Klagholz and Dr. Anderson at the remand hearing prior to *Abbott V.* Unlike the Court, I am unpersuaded that this record reliably suggests that a shortage of certified teachers exists, nor is there any reliable indication that a belief in the existence of a teacher shortage explains the DOE's authorization to staff preschool classes with uncertified teachers. Nevertheless, although the four-year period the Court allows for qualified existing teachers to obtain certification, *ante* at 111–12, 748 *A.*2d at 91, results in a significant delay in achieving the standard of uniform certification of preschool teachers, a compromise between the DOE's longer timetable and the ideal of an immediate certification requirement is appropriate to avoid the discharge of experienced but uncertified teachers. In my view, however, districts would be well advised to assess currently the skills of all uncertified classroom teachers in community-based child care centers to determine whether they should be retained and afforded four years to obtain certification. The Court's adherence to a preschool class size of fifteen students with one teacher and one aide is both educationally sound and accurately reflects the representations made by the DOE's witnesses at the remand hearing.

The Court's determination to sustain the DOE's requirement that the Abbott districts use the facilities of local day care providers "whenever practical" attempts to deal pragmatically with a complex problem. Some districts were operating preschool programs within their own facilities prior to *Abbott V* and the DOE's regulation does not disturb those existing arrangements. To require all the Abbott districts to house preschool programs

within district-owned facilities would be expensive and, to the extent local day care facilities are structurally adequate and safe and their programs are upgraded to comply with the standards included in the Court's opinion, unnecessary. Daycare facilities that are structurally unsuitable or whose administrators are unwilling or unable to meet the standards prescribed by the Court need not be used. I trust that the DOE will not reflexively reject district determinations that specific daycare facilities are inadequate or inappropriate for preschool programs.

Moreover, the Court makes clear, *ante* at 115–16, 748 *A.*2d at 93, that the DOE's regulations must authorize the districts to regularly assess and evaluate district preschool programs conducted in community care facilities, require modifications and improvements in such programs, provide supervision, professional development, access to district staff (especially with kindergarten and first-grade teachers), and—ultimately—to terminate the contract of a local facility that fails to adhere to quality standards. The Court's recognition of the Abbott districts' non-delegable responsibility for the success or failure of all preschool programs—whether run in district facilities or in local provider facilities—will avoid the concern that preschool programs within a single Abbott district will be of unequal quality.

The Court appropriately insists that children currently served by Head Start programs cannot be excluded from district preschool programs unless the specific Head Start facility provides high quality programs that meet DOE standards. That determination is consistent with the observation of Dr. Allen Odden, the consultant to the remand court, that "Head Start usually provides only a partial day program and funding has been insufficient to provide a program that meets standards for a high quality, effective program." *Abbott V, supra,* (Appendix II) 153 *N.J.* at 648, 710 *A.*2d 450.

The Court elects not to intervene in or require modifications of the DOE's procedures concerning funding requests for preschool programs, other than to "urge the Commissioner to work with the

districts to resolve funding issues expeditiously," *ante* at 118, 748 A.2d at 95. However, I find most disturbing the context in which that issue arose.

The record indicates that in regulations adopted in July 1998, the DOE directed the Abbott districts to submit preschool plans for the 1999–2000 school year by November 2, 1998, but the written instructions governing the preparation of those plans were not issued by the Commissioner until September 30, 1998. According to the affidavit of the Education Law Center's Abbott Initiative Research Director, the district plans included a diverse range of health, social services, educational staff requests and other programs to meet specific needs of preschool pupils. Among the specific staff and service requests included in the district plans were provision for child study teams, speech therapists, bilingual teachers, art and music programs, nurses, social workers, nutrition programs, and parent involvement programs. Those proposals for preschool programs and funding were consistent with the Commissioner's written submission to the remand court in which he promised "[w]ell-planned, high quality half-day preschool programs that encompass these services (e.g., instructional, medical, dental, parent involvement and training, etc.)." *A Study of Supplemental Programs and Recommendations for the Abbott Districts, New Jersey Department of Education,* (Nov. 1997) at 8.

The DOE did not respond to the District's program submissions until February 11, 1999, more than three months after they were received. Its response essentially consisted of a "form" letter that rejected categorically all program submissions and requests that required additional funding on the ground that those requests were required to be submitted as part of a separate and distinct funding approval process. Moreover, the districts were informed that their program submissions could not be considered until they had demonstrated collaboration to the extent practical with existing DHS licensed child care providers.

Significantly, the districts were required to submit their budget requests for the next school year by February 28, 1999 (extended by DOE to March 5, 1999), approximately three weeks after the DOE's form letters were received, and no budget request could be approved for preschool costs or programs not previously authorized by the DOE. As a result, the districts were virtually compelled to revise their Abbott preschool plans to comply with the DOE restrictions, using DHS child care standards for program quality and eliminating all services, staff, and supplemental programs not approved by the DOE.

The DOE's process in 1999 for approving preschool programs and funding requests was formalistic, inflexible and inconsistent with the Court's anticipation in *Abbott V* that requests for supplemental funding would be fairly and objectively reviewed and would be granted if need is demonstrated:

> *Underlying the Commissioner's proposal for whole-school reform, early child-hood programs, and supplemental programs, is the clear commitment that if there is a need for additional funds, the needed funds will be provided or secured....* If a school demonstrates the need for programs beyond those recommended by the Commissioner, including programs in, or facilities for, art, music, and special education, then the Commissioner shall approve such requests and, when necessary, shall seek appropriations to ensure the funding and resources necessary for their implementation.
>
> [153 *N.J.* at 518, 710 *A.*2d 450 (emphasis added) (citations omitted).]

Well-planned and appropriate programs, together with sufficient resources to implement them effectively, are fundamental to the long-term success of the *Abbott V* reforms. The DOE can stifle progress in the Abbott districts if it ties up funding requests in a bureaucratic maze; or it can advance and encourage these vital initiatives by dealing with funding requests swiftly, fairly and effectively.

The Court also addresses and resolves the controversy over the DOE's insistence that the Abbott districts plan for only seventy-five percent rather than one hundred percent of anticipated preschool enrollment. The Court makes clear that districts may increase their planning estimates if warranted, and that in any event the districts are required to accommodate every child eligi-

ble for admission to preschool. The record suggests that some districts, perhaps out of a sense that their role in providing preschool had been diminished because of the DOE's insistence on collaboration with local child care providers, did not actively solicit preschool enrollment for the 1999–2000 school year. The Court's opinion makes clear that the districts ultimately have responsibility for all preschool programs, including those run in child care centers; in addition, the Court imposes on the districts the duty to conduct all necessary outreach efforts to enroll all eligible children in preschool, with supplemental funding from the DOE if required. *Ante* at 118–19, 748 *A*.2d at 95.

The Court also concludes that the Office of Administrative Law (OAL), not a Standing Master, shall continue to resolve disputes arising out of disagreements between the districts, the schools and the DOE in the implementation of the *Abbott V* reforms. I join that disposition at this stage of implementation, in the hope that the DOE's resolution of program and funding requests after the Court's disposition of this Motion will not continue to result in the epidemic of appeals now pending before the OAL. Appeals from the denial of program and funding requests were filed by or on behalf of seventeen of the thirty Abbott districts. The education reforms ordered by this Court were meant to be evaluated in the classroom, not in a courtroom. If the process continues to be plagued by a multiplicity of appeals, a Standing Master designated by this Court may in my view be necessary to assure speedy and uniform resolution of disputes consistent with *Abbott V*. In the meantime, I trust that the OAL will deal expeditiously and effectively with both new and pending appeals in time for final dispositions to be reflected in the classroom during the next school year.

## II

The collateral issue implicated but not expressly raised by the motion pending before the Court is whether the approach and procedures that led to the deficiencies in the DOE's implementa-

tion of mandatory preschool are likely to affect adversely the overall implementation of Whole School Reform and other programs mandated by *Abbott V.* That question is one of critical importance and warrants comment even in the absence of a more specific record.

The effectuation of the *Abbott V* requirements involves both a large scale and long-term cooperative effort between the DOE, the Abbott districts and the Abbott schools, much more in the nature of a marathon than a sprint. Good will, flexible rather than rigid procedures, reasonable expectations, and trust among the collaborating entities will be essential. Moreover, vigorous leadership on the part of the Commissioner and sustained support and encouragement from the DOE will be critical if the reforms are to succeed. Of paramount and overriding importance is a comprehensive long-term perspective: the *Abbott V* reforms are not isolated initiatives, but instead are an inter-dependent and cohesive effort toward permanent urban school educational improvements.

The mandate for preschool and full-day kindergarten is intended to provide the public schools with earlier access to urban children in order to better prepare them to benefit from the focus on reading and language skills that underlies the Commissioner's recommendation of whole school reform for elementary schools. As the Court observed in *Abbott V:* "Empirical evidence strongly supports the essentiality of pre-school education for children in impoverished urban school districts. That evidence demonstrates that the earlier education begins, the greater the likelihood that students will develop language skills and the discipline necessary to succeed in school." 153 *N.J.* at 503–04, 710 *A*.2d 450.

The high-quality specific preschool and kindergarten programs ordered by the Court are part of an overall effort. The educational quality of preschool and full-day kindergarten have a direct impact on the potential for success of whole school reform. Conversely, the effectiveness of whole school reform, and specifically the effectiveness of Success for All (SFA), the presumptive model

of elementary whole school reform, ultimately will determine whether the investment of money and staff in mandatory preschool and full-day kindergarten will yield significant and measurable results. In that context, I must express some preliminary concerns about the reported implementation of whole school reform, an issue not before us but one that unavoidably affects the results of the preschool course correction the Court mandates in its opinion.

The Commissioner's recommended version of whole-school reform for elementary schools is Success for All, "a nationally proven program that addresses the reading deficits of low-income, at-risk public school children." *Abbott V, supra,* 153 *N.J.* at 494, 710 *A.*2d 450. *See also* Christopher Jencks and Meredith Phillips, *The Black–White Test Score Gap,* 343, 346 (1998) ("Success for All is the only well-documented widely replicated program to improve elementary school instruction that uses comparison groups and covers large numbers of black children across several states and cities. ... Success for All shows that it is possible to produce sustained improvement in students' achievement test scores when schools and communities make the commitment to do so."); James Traub, *Schools Are Not The Answer, N.Y. Times Magazine,* Jan. 16, 2000 at 56 ("The most popular [schoolwide reform] model among inner-city schools, and the most successful, is a reading program called Success for All, which has expanded into a whole-school reform known as Roots and Wings. The premise of Success for All is that reading is the key to success in school, and that the best way to teach reading ... is to focus relentlessly on 'prevention and early intervention' rather than on remediation").

Based on its demonstrated record of success, this Court adopted the recommendations of the Commissioner and of Judge King, who presided at the remand hearing, that the Abbott districts be required "to adopt some version of a proven, effective whole school design with SFA—Roots and Wings as the presumptive elementary school model." *Abbott V, supra,* 153 *N.J.* at 501, 710 *A.*2d 450. We acknowledged the Commissioner's recommendation that "a

school could adopt one of the other four [approved] models ... *if it could show convincingly that the alternative model it chose would be equally effective and efficient as SFA or that the model was already in place and operating effectively."* *Id.* at 494, 710 A.2d 450 (emphasis added). Clearly, the Court contemplated that the vast majority of the Abbott schools would select and implement Success for All. We observed in *Abbott V:*

> The Center for Social Organization of Schools, the SFA sponsor organization, estimates that it could implement SFA in fifty Abbott schools in the 1998–1999 school year, in 100 Abbott schools in the following year, and in the remaining Abbott elementary schools in the third year. It takes three years to implement SFA fully in any given school. Thus, under the Commissioner's recommendations, SFA could be fully operative in all Abbott elementary schools within five years.
>
> [153 *N.J.* at 496, 710 *A.*2d 450.]

See also *id.* at 501–02, 710 *A.*2d 450 (directing Commissioner to implement an evaluation program *"to verify that SFA is being implemented successfully and is resulting in the anticipated level of improvement in the Abbott elementary schools"*) (emphasis added).

Because of the critical importance this Court attached to the recommendation and designation of SFA as the presumptive whole school reform model for Abbott elementary schools, I find most alarming the recently reported data indicating that of the seventy-two schools in the first cohort of schools to implement whole school reform in 1998, only twenty-seven schools selected SFA and, of those, fourteen schools had implemented SFA prior to *Abbott V.* See Erlichson, Goertz and Turnbull, *Implementing Whole School Reform in New Jersey: Year One in the First Cohort Schools* 7 (October 1999) (Erlichson). Early reports indicate that only twenty-three schools in the second cohort selected SFA. That unexpectedly low rate of selection of SFA should influence the DOE more aggressively to encourage selection of SFA and to reconsider its passive regulatory standard. *N.J.A.C.* 6:19A–4.1(a) provides that "[t]he presumptive model shall be Success for All—Roots and Wings (SFA/R & W). *Permission to use other models may be granted by the Department where the choice of such models is justified."* (Emphasis added).

The *Erlichson* report stated that the model selection process was characterized by "limited information, a lack of significant teacher involvement, and a timeframe that precluded true deliberation." *Erlichson, supra,* at 11–13. It also indicated that the DOE did not participate significantly in the process by which the individual schools selected whole school reform models. In that context, it bears repeating that the Constitution imposes on the State the obligation to provide a thorough and efficient education for all children. *N.J. Const.* Art. VIII, § 4, ¶ 1.

The prospect that a relatively small percentage of Abbott schools, rather than the vast majority as anticipated by the Court, is selecting SFA as the whole school reform model is disconcerting and inauspicious. Little or no evidence about the success rate of the other models was presented to the remand court by the Commissioner. The Court clearly anticipated that the Commissioner would sharply restrict the ability of schools to select other models absent a strong showing of good cause.

Other significant and troublesome observations in the Erlichson report include a finding that although the DOE awarded $50,000 whole school reform implementation grants to each of the first cohort elementary schools that filed grant applications by August 1998, to be used for training, materials and payment of costs to the model sponsors, none of the schools had received the grant money as of June 1999. *Erlichson, supra,* at XII. Moreover, the report states that "the school-based budgeting process in the Cohort I schools was an ill-informed, somewhat chaotic, and very frustrating experience," noting that "schools were left to devise budgets without guidance from the State, districts or developers." I note that the findings in the *Erlichson* report were among the subjects considered at a public hearing in December 1999 conducted by the Abbott Subcommittee on the Public Schools, focusing on "Evaluation of the first year implementation of Whole School Reform."

As noted, this Court's basic assumption concerning whole school reform was that, with few exceptions, SFA would be the model

implemented in the Abbott elementary schools. The SFA program is rigorous and demanding, and contemplates advance approval by eighty percent of the teachers and staff. Nevertheless, I have no doubt that such approval could readily be obtained if this Court's findings and SFA's record of achievement were communicated effectively by the DOE and by administrators in the schools and districts. The Court also was assured by the Commissioner and the DOE that the schools would receive necessary funding and other resources to enable them to bear the burden of whole school reform implementation. As we noted in *Abbott V:*

> The Commissioner voiced the State's strong commitment to implementing whole-school reform. The DOE will facilitate the implementation process by providing resources to help review budgets, coordinating necessary support, and assisting in the transition from centralized to site-based management. If a district or school is hesitant in its implementation of whole-school reform, the DOE will exercise its "essential and affirmative responsibility" to ensure the necessary changes.
>
> [153 *N.J.* at 496, 710 *A.*2d 450.]

Based on the available information, I am deeply concerned that the DOE's implementation of whole school reform also may be off course. I urge the Commissioner to re-examine the Department's implementation strategy for whole school reform in the context of this Court's opinion and assumptions in *Abbott V.* What this Court clearly contemplated—that SFA would be the whole school reform model used in the vast majority of Abbott schools—simply has not occurred.

Only two years have elapsed since *Abbott V* was decided. As evidenced by the Court's disposition of this Motion, significant adjustments in approach and in implementation of the *Abbott V* reforms periodically may be required in the interest of the children whose education and future prospects are at stake. In an undertaking of this complexity, missteps are virtually certain to occur. However, those missteps and the resulting course corrections will be long forgotten if, over time, the reform efforts now under way succeed. But the clock is ticking, and for each school year in which implementation is delayed or flawed, thousands of urban children will lose the full benefit promised by the Abbott

initiatives. The time for bold, corrective and decisive action by the DOE is now.

*For granting in part; denying in part*—Chief Justice PORITZ, and Justices O'HERN, GARIBALDI, STEIN, COLEMAN and LONG—6.

*Opposed*–None.